STANLEY E. PARK AND CAROLYN L. PARK, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Park v. Commissioner
Docket No. 29466-91
United States Tax Court
T.C. Memo 1994-343; 1994 Tax Ct. Memo LEXIS 341; 68 T.C.M. (CCH) 184; July 25, 1994, Filed *341 Decision will be entered under Rule 155. Stanley E. Park, pro se. For respondent: Elizabeth S. Simmons. MEMORANDUM FINDINGS OF FACT AND OPINION BEGHE, Judge: Respondent determined the following deficiency in and additions to Mr. Park's Federal income tax: Additions to tax
Year
Deficiency
Sec. 6651(a)(1)
Sec. 6653(a)
Sec. 6661
1985
$ 8,779.85
$ 1,883
[1] $ 687.65 $ 2,120
Respondent determined the following deficiencies in and additions to petitioners' Federal income tax: Additions to tax
Year
Deficiency
Sec. 6651(a)(1)
Sec. 6653(a)
Sec. 6661
1986
$ 8,202.41
--- [1] $ 410.12
$ 1,620.35
1987
7,030.53
$ 683.65
[1] 684.98
1,508.10
All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. The parties have settled some issues by stipulation, leaving the following issues for decision: (1) Unreported gross receipts from Mr. Park's tax return preparation *342 business; [1] (2) business deductions for payments to office help; (3) rental losses from Mr. Park's Tybee Island, Georgia, property (Tybee Island property or Tybee Island); (4) business deductions for 1986 with respect to a trailer rented to a third party; (5) itemized deductions for charitable contributions for 1985, 1986, and 1987; [2] (6) additions to tax for failure to file a return under section 6651(a)(1) for 1985 and 1987; and (7) additions to tax for negligence under section 6653(a)[3] and for substantial understatement under section 6661 for 1985, 1986, and 1987. *343 We find that, although petitioners underreported gross receipts from Mr. Park's tax return preparation business, the underreported amounts were less than the amounts determined by respondent. We sustain respondent's other adjustments. FINDINGS OF FACT When petitioners filed their petition, they resided in Calhoun, Tennessee. Mr. Park filed his 1985 Form 1040 on August 15, 1986. Petitioners filed their 1986 Form 1040 on April 15, 1987, and their 1987 Form 1040 on October 12, 1988. Petitioners did not file for an extension of time for filing for any of these years. During the years in issue, Mr. Park worked at the Bowater Southern Paper Co. paper mill (Bowater) in Calhoun. His work schedule at Bowater changed weekly, rotating from third shift, to second shift, to first shift, and then to third shift again. Mr. Park also operated a tax return preparation business. Schedule C of petitioners' Forms 1040 for 1985, 1986, and 1987 reported gross receipts from the tax return preparation business of $ 10,783, $ 11,420, and $ 13,620, respectively. As part of a project targeting tax return preparers, respondent selected petitioners' returns for audit. During the audit, Mr. Park provided *344 respondent with ledgers showing that he prepared 548, 548, and 458 returns for which he charged $ 12,973, $ 10,880, and $ 10,800 for 1985, 1986, and 1987, respectively. Respondent determined that, during 1985, 1986, and 1987, Mr. Park prepared 624, 636, and 658 returns, respectively, for which he was paid $ 21,245, $ 18,280, and $ 23,795, respectively. Although Mr. Park did prepare the numbers of returns determined by respondent, he was paid $ 16,835, $ 15,122.50, and $ 19,137.50, for the respective years in issue, for preparing those returns. Schedule C of petitioners' Forms 1040 for 1985, 1986, and 1987 reported deductions for labor of $ 2,550, $ 2,850, and $ 3,320, respectively, of which respondent allowed $ 820 for 1986 and $ 790 for 1987. Mr. Park had paid cash for general office help but did not have any receipts or other records to substantiate payments in excess of the amounts allowed by respondent. Mr. Park did not issue or file any Forms W-2 or 1099 with respect to his payments for office help for 1985, 1986, and 1987. In 1975, Mr. Park purchased the Tybee Island property, consisting of a house and land located on Tybee Island, Georgia, approximately 400 miles from *345 petitioners' home and work places in Calhoun, Tennessee. For the years in issue, Mr. Park calculated depreciation on the house using the straight-line method, a useful life of 10 years, and a placed-in-service date of 1984. On Schedule E of petitioners' returns, they deducted depreciation of $ 3,120 on Tybee Island for each of the years in issue. Among other days of work at Bowater, Mr. Park worked seven second shifts from Friday, June 14, 1985, through Thursday, June 20, 1985, and the third shift on June 19, 1985 (working from 3:30 p.m. on June 19, 1985, until 7 a.m. on June 20, 1985, and again from 3 p.m. until 11:30 p.m. on June 20, 1985); and he worked the first shift on Saturday, July 20, 1985, and on Sunday, July 21, 1985. On Monday, August 4, 1986, and on Tuesday, August 5, 1986, Mr. Park worked the third shift; on Thursday, August 7, 1986, he did not work; on Friday, August 8, 1986, he worked the second shift; and he worked every day from Friday, August 8, 1986, through Wednesday, August 13, 1986. Mr. Park worked the third shift on June 8 and 9, 1987, and the second shift from June 12 through June 24, 1987. During the years in issue, Mr. Park owned a trailer. During *346 1985, he lived in it, but, during 1986 and 1987, he rented it to a third party. Schedule E of petitioners' 1986 and 1987 Forms 1040 reported rental losses from the trailer of $ 1,266 and $ 800, respectively. Respondent determined that allowable rental losses for 1986 and 1987 were $ 205.91 and $ 1,661.28, respectively. For 1985, 1986, and 1987, petitioners claimed charitable deductions of $ 885, $ 2,520, and $ 1,585, respectively, for cash contributions. Respondent disallowed $ 793, $ 2,060, and $ 1,285 of those deductions for those respective years. Petitioners did not maintain canceled checks, receipts, or other reliable written records to substantiate the amounts disallowed by respondent. OPINION When the Internal Revenue Service audits a taxpayer's return, the taxpayer should provide the auditor with documentation to support the amounts of income reported and deductions claimed. Oral assurances are suspect, and if satisfactory records are not provided, the auditor will try to verify the taxpayer's contentions by means of an indirect method. 1 Audit, Internal Revenue Manual (CCH), sec. 820, at 7245-27. Respondent found errors, inconsistencies, and omissions in Mr. Park's *347 records. As a result of the inadequacy of those records, respondent reconstructed the gross receipts of Mr. Park's tax return preparation business by using an indirect method, and disallowed various deductions. We too have found Mr. Park's records to be generally inaccurate and unreliable. We have generally sustained respondent's determinations except with respect to the average amounts Mr. Park charged for preparing various types of tax returns. Issue 1. Tax Preparation Services -- Gross Receipts
Taxpayers must keep records that can be used to establish their gross income. DiLeo v. Commissioner, 96 T.C. 858, 867 (1991), affd. 959 F.2d 16 (2d Cir. 1992); sec. 1.6001-1(a), Income Tax Regs. The Commissioner has considerable freedom to select a method to test whether a taxpayer's records reflect all the taxpayer's income. Holland v. United States, 348 U.S. 121, 131-132 (1954). Once the Commissioner finds that a taxpayer's records are incomplete or that they do not accurately establish income, she may reconstruct the taxpayer's income using a method that in her opinion does clearly *348 reflect income. Sec. 446(b); Mallette Bros. Constr. Co. v. United States, 695 F.2d 145, 148 (5th Cir. 1983); Menequzzo v. Commissioner, 43 T.C. 824, 831 (1965). Only where the Commissioner's determination of unreported income has no rational basis or is arbitrary will it not be afforded the presumption of correctness. Helvering v. Taylor, 293 U.S. 507, 513-514 (1935); Llorente v. Commissioner, 74 T.C. 260, 264 (1980), affd. in part, revd. in part and remanded 649 F.2d 152 (2d Cir. 1981). A determination has no rational basis where no substantive evidence links the taxpayer to the income-producing activity, Weimerskirch v. Commissioner, 596 F.2d 358, 360 (9th Cir. 1979), revg. 67 T.C. 672 (1977), or to the receipt or expenditure of funds, Tokarski v. Commissioner, 87 T.C. 74, 76 (1986). A determination is arbitrary where the Commissioner's computations are internally inconsistent, Welch v. Commissioner, 297 F.2d 309, 311 (4th Cir. 1961), *349 revg. and remanding T.C. Memo. 1960-163, or where the Commissioner offers no direct evidence but rests entirely on the burden of proof, Llorente v. Commissioner, supra at 264. In this case, respondent found that Mr. Park's records did not clearly reflect income, and she used a variation of the "unit and volume method" to reconstruct petitioners' income. See 1 Audit, Internal Revenue Manual (CCH), sec. 844, at 7247-14. Respondent linked petitioners to the income-producing activity, adjusted her calculations for known inconsistencies, and provided direct evidence to support her adjustments. Although petitioners showed errors in respondent's calculations, respondent's treatment of those errors indicates that her calculations were conservative and that doubtful items were resolved in petitioners' favor. We find respondent's method of reconstructing petitioners' income to be rational, objective, consistent, and properly supported by the evidence. Respondent used a variation of the unit and volume method to reconstruct petitioners' gross receipts by applying price and profit figures to the known or ascertainable volume *350 of business done by the taxpayer. This method is feasible when the examiner can ascertain the number of units handled by the taxpayer and also knows the price or profit charged per unit. The number of units or volume * * * handled may have to come from third party sources * * * [, such as] * * * a regulatory agency to which the taxpayer reports. [Id.]
To determine total gross receipts from the tax return preparation business, respondent used information provided by Mr. Park, directly and indirectly, to ascertain how many units (returns) Mr. Park handled (prepared) and the prices he charged for those returns. Respondent properly modified this simple approach to account for different prices charged for different types of return forms used and for returns prepared without charge. See Rowell v. Commissioner, T.C. Memo. 1988-410, affd. 884 F.2d 1085 (8th Cir. 1989). From information gathered when tax returns are processed, respondent generated a list (preparer list) of returns, on which Mr. Park signed as paid preparer for each year in issue. Respondent compared the number of returns shown in the ledgers provided *351 by Mr. Park with the number of returns shown in the corresponding preparer list. The preparer lists showed that Mr. Park signed as paid preparer on 569, 636, and 658, returns in 1985, 1986, and 1987, respectively. The ledgers Mr. Park provided respondent showed that he prepared 548, 548, and 458 returns, respectively, for those years. Because the ledgers showed significantly fewer returns than the preparer lists, respondent made independent calculations to determine petitioners' gross receipts from the tax return preparation business. For each year, respondent's calculations were based on three categories of returns, the number of returns prepared for each category, the estimated average charge for preparing a return in each category, and an adjustment for returns prepared without charge. For 1985, respondent also included gross receipts from bookkeeping and equipment rental. From information included on the preparer lists, respondent categorized the returns prepared by Mr. Park as Forms 1040A, Forms 1040, and Forms 1040 with Schedule C or Schedule F (Schedule C or F returns). The preparer lists include the Social Security number and first four letters of the customer taxpayer's *352 name, the document locator number [4] (DLN) of each return listed, and information from various lines of the listed returns and attached schedules. Forms 1040A and 1040 are clearly identified by codes in the DLN's of the listed returns. Schedule C or F returns are clearly identified by an entry in one of two columns, labeled "SCH C" and "SCH F". Because the preparer lists did not identify returns that included Schedule E, those returns are not separately categorized. For each year in issue, respondent determined the number of returns in each category. Respondent first identified and counted the Forms 1040A and Schedule C or F returns [5] on a preparer report, *353 and then subtracted the number of returns in those two categories from the total number of returns listed for that year to determine the number of returns in the Form 1040 category. For 1985, respondent also compared Mr. Park's 1985 ledger with the 1985 preparer list. From that comparison, she identified and counted 55 returns that were in Mr. Park's ledger for 1985 but were not on the 1985 preparer list. [6] Respondent included these returns in the Form 1040 category. Using the method described above, respondent determined that Mr. Park prepared the following number of returns in each category for the years in issue: 1985
1986
1987
Forms 1040A
156
151
160
Forms 1040
248
453
253
Schedule C or F returns
220
32
245
Total
624
636
658
*354 At the initial interview between Mr. Park and respondent's revenue agent, the revenue agent asked Mr. Park for a schedule of his rates. Later in the audit, the revenue agent again asked for the rate schedule. The revenue agent testified that, during the initial interview, Mr. Park told her that he charged $ 10 for a Form 1040A, $ 20 for a Form 1040, and $ 50 for a Schedule C or F return. She testified that, during the later interview, Mr. Park told her that he charged between $ 10 and $ 20 for a Form 1040A, between $ 30 and $ 40 for a Form 1040, and $ 50 for a Schedule C or F return. Respondent used these amounts to determine that, in 1985, 1986, and 1987, Mr. Park charged an average of $ 15 for a Form 1040A and $ 35 for a Form 1040; that, in 1985 and 1986, he charged an average of $ 50 for a Schedule C or F return; and that, in 1987, he charged an average of $ 57.50 for a Schedule C or F return. [7]
*355 Respondent determined that Mr. Park did not always charge for preparing a return, even when he prepared the return and signed as a paid preparer (no-charge returns). However, respondent's method of categorizing returns did not account for no-charge returns. To adjust for no-charge returns, respondent determined that Mr. Park did not charge for 40, 48, and 43 returns in 1985, 1986, and 1987, respectively, and that the average charge for those returns would have been $ 30 in 1985 and 1986, and $ 36 in 1987. To determine the total gross receipts for each year, respondent multiplied the number of returns in each category (including no-charge returns) by the average charge for that category for that year, added the resulting amounts for the three categories, and then subtracted the appropriate amount for no-charge returns. For 1985, respondent also added $ 375 of "Bookkeeping receipts" and $ 50 of "Equipment rental". Mr. Park's ledgers showed that he charged $ 12,973, $ 10,880, and $ 10,800 for 1985, 1986, and 1987, respectively. Petitioners' Schedules C reported gross receipts of $ 10,783, $ 11,420, and $ 13,620, for 1985, 1986, and 1987, respectively. Mr. Park's only explanation *356 for the discrepancies between the ledgers and the Schedules C was that "mistakes were made". Because petitioners did not describe these mistakes or explain why returns prepared by Mr. Park were not shown on his ledgers, we could not determine the correct amount of gross receipts using either the ledgers or the Schedule C of the returns. Petitioners asserted that, because the number of returns in the Form 1040 and the Schedule C or F return categories is inaccurate for 1986, respondent's entire calculation is faulty. We disagree and note that the total number of returns is relatively consistent from year to year and that respondent's conservative approach to categorizing returns favors petitioners because it understates the number of higher priced Schedule C or F returns. Mr. Park testified at trial that how much he charged depended on his relationship to the taxpayer and the difficulty of the return, but that he generally charged between $ 5 and $ 10 for a Form 1040A, between $ 20 and $ 40 for a Form 1040, and between $ 30 and $ 50 ($ 65 in 1987) for a Schedule C or F return. Mr. Park, in support of his testimony, introduced his ledgers, which were prepared contemporaneously *357 by Mr. Park and people working for him. We have found that, insofar as these ledgers evidenced Mr. Park's average charges, they were credible and consistent with, and supportive of, his testimony. The testimony of respondent's revenue agent on her discussions with Mr. Park about his charges is somewhat contrary to Mr. Park's testimony about his rates. After comparing Mr. Park's ledgers with the preparer lists, we have found that respondent's agent overstated Mr. Park's average charges for the various returns. We have found that, in 1985, 1986, and 1987, Mr. Park charged an average of $ 7.50 for a Form 1040A and $ 30 for a Form 1040; and that, in 1985, 1986, and 1987, he charged an average of $ 40, $ 50, [8] and $ 47.50, respectively, for a Schedule C or F return. *358 We accept respondent's determination of the number of no-charge returns. However, we have compared Mr. Park's ledgers with the preparer lists and have found that, on average during 1985 and 1986, Mr. Park would have charged $ 25 for a no-charge return, and that, on average during 1987, he would have charged $ 30 for a no-charge return. We agree with respondent on the methodology to recreate petitioners' gross receipts, on the number of returns prepared by Mr. Park, and on the bookkeeping and equipment rental receipts. We agree with Mr. Park on the average charges to prepare the various types of returns, amounts that are consistent with Mr. Park's ledgers. As summarized in our findings of fact and detailed in the appendix, we have redetermined that the gross receipts for Mr. Park's tax return preparation business were $ 16,835, $ 15,122.50, and $ 19,137.50 in 1985, 1986, and 1987, respectively. Issue 2. Tax Preparation Services -- Office Help
Taxpayers must keep records sufficient to substantiate the deductions shown in their tax returns. Sec. 6001(a); sec. 1.6001-1(a), Income Tax Regs. However, when we are convinced from the record that the taxpayer made expenditures, *359 we are permitted to estimate the deductible expense, bearing heavily upon the taxpayer whose inexactitude is of his own making. Cohan v. Commissioner, 39 F.2d 540 (2d Cir. 1930); Polyak v. Commissioner, 94 T.C. 337, 345 (1990). When a taxpayer does not provide an evidentiary basis on which we can estimate the expense, we will not allow deductions for the unsubstantiated expenditures. Polyak v. Commissioner, supra at 345-346; Vanicek v. Commissioner, 85 T.C. 731, 743 (1985). Although there is a line entitled "Wages" on Schedule C of Form 1040 for the years in issue, petitioners claimed amounts allegedly paid for office help as deductions for "C. Labor" on the lines on Schedule C entitled "Other Expenses". For 1985, respondent disallowed all petitioners' claimed deduction for "C. Labor". For 1986 and 1987, respondent allowed deductions for "C. Labor" in the amounts recorded in Mr. Park's ledgers, [9] but disallowed deductions in excess of those amounts. Mr. Park asserts that the unsubstantiated amounts were paid to Ms. Demott for general office help. *360 Mr. Park makes the point that he could not have worked full time for Bowater and had time to run his tax preparation service without help. We agree and note that, throughout the years in issue, there are at least two distinct styles of handwriting on Mr. Park's ledgers. See Fed. R. Evid. 901(b)(3); Bagby v. Commissioner, 102 T.C. 596, 606 (1994). Ms. Demott did not appear as a witness at trial, and petitioners did not produce the payroll records that Mr. Park said she had kept. Mr. Park did not explain Ms. Demott's failure to appear at trial, why he paid cash, or why he did not issue Forms W-2 or 1099. Although we believe that Mr. Park had some person or persons working for him, to whom he made payments in addition to the payees and amounts he *361 has substantiated, we are not persuaded that we should estimate his deductible expense for labor. Cf. Langlois v. Commissioner, T.C. Memo. 1988-415 (expense estimated where in-kind payments did not lend themselves to recordkeeping), affd. without published opinion 886 F.2d 1316 (6th Cir. 1989). A business taxpayer who facilitates his or her service providers' nonreporting of income by paying cash and not filing or issuing information returns should bear a heavy burden of substantiating the payments. When such a taxpayer cannot meet that burden of proof, he or she should bear the burden of paying tax on the income that is otherwise "lost" from the tax system. With this heavy burden of proof in mind, we decline to apply Cohan v. Commissioner, supra, to approximate the amounts Mr. Park paid for office help in addition to the amounts allowed by respondent. We sustain respondent's disallowances of petitioners' claimed deductions for "C. Labor". Issue 3. Schedule E -- Tybee Island
During a year in which a dwelling unit is used for personal purposes for more than the greater of 14 days *362 or 10 percent of the number of days the unit was rented at fair market value, section 280A disallows deductions (other than deductions allowable without regard to their connection with the taxpayer's trade or business) not attributable to certain business uses of, or rental of, the dwelling unit. Sec. 280A(a), (b), and (c). If a dwelling unit was used for any part of the day by the taxpayer or a member of his family, the unit is considered to have been used for personal purposes for that day. Sec. 280A(d)(2). Respondent disallowed losses for 1985 and 1987, and determined net income for 1986, on Tybee Island "because it has not been established that the requirements of section 280A have been met or that any losses are otherwise allowable." Petitioners have the burden of proving that disallowed losses are allowable. Rule 142(a). Mr. Park asserted that he used Tybee Island for less than 14 days during each of the years in issue. To support his assertions, petitioners provided respondent with two pocket-sized date books and a notebook. [10] The date books and notebook are replete with inconsistencies, and we give them no weight. *363 The date book purporting to show that petitioners used Tybee Island less than 14 days in 1985 ("1985" date book) is actually a 1984 date book. For 1985, when Mr. Park was single, there are two distinct handwriting styles in his "1985" date book, and the entries that are not in Mr. Park's handwriting are extensive and seem to be tracking the increases and decreases of something. The "1985" date book indicates that on most Sundays Mr. Park gave $ 20 to the Valley View Baptist Church. However, because the "1985" date book is actually a 1984 date book, a date shown as Sunday was actually Monday. [11] On June 16 and 17, shown as Saturday and Sunday, Mr. Park wrote "Me at Beach" in the "1985" date book, but, according to his time cards from Bowater, he worked seven second shifts from Friday, June 14, 1985, through Thursday, June 20, 1985, plus a third shift starting on June 19, 1985. On July 21 and 22, shown as Saturday and Sunday, Mr. Park wrote "Me at Beach 4 days" in the "1985" date book, but, according to his time cards from Bowater, he worked the first shift on Saturday, July 20, 1985, and on Sunday, July 21, 1985. Tybee Island is approximately 400 miles from Calhoun, Tennessee, *364 where petitioners reside and work. Mr. Park did not explain these, or other, inconsistencies in the "1985" date book. The date book purporting to show that petitioners used Tybee Island less than 14 days in 1986 ("1986" date book) is actually a 1979 date book. The notations tracking increases and decreases are not in the "1986" date book. The "1986" date book indicates that on most Sundays Mr. Park gave $ 20 to the Valley View Baptist Church. However, because the "1986" date book is actually a 1979 date book, a date shown as Sunday was actually Tuesday. [12] On August 7, shown as a Tuesday, Mr. Park wrote "day shift"; but, according to his time cards from Bowater, on Monday, August 4, 1986, and on Tuesday, August 5, 1986, Mr. Park worked the third shift; on Thursday, August 7, 1986, he did not work; and, on Friday, August 8, 1986, he worked the second shift. On August 11, shown as a Friday, Mr. Park wrote "Tybee", *365 and on August 14, shown as a Tuesday, Mr. Park wrote "Home". Mr. Park testified that these notations meant that he drove to Tybee Island on the day labeled "Tybee" and drove home on the day labeled "Home". However, according to his time cards from Bowater, Mr. Park worked every day from Friday, August 8, 1986, through Wednesday, August 13, 1986. Mr. Park did not explain these, or other, inconsistencies in the "1986" date book. The notebook purporting to show that petitioners used Tybee Island less than 14 days in 1987 (1987 date book) is a spiral-bound notebook, each page of which represents a week. Disregarding marks made by respondent, all the handwriting in the 1987 date book appears to have been written in the same ink. The handwriting in the two date books appears to be in at least two different inks. On June 8, Mr. Park wrote "Tybee", and on June 14, he wrote "Home". However, according to his time cards *366 from Bowater, Mr. Park worked the third shift on June 8 and 9, 1987, and second shift from June 12 through June 24, 1987. Mr. Park did not explain these, or other, inconsistencies in the 1987 date book. We find the entries in the date books to be incredible, and we give them no weight. Nor do we accept Mr. Park's assertions that he did not visit Tybee Island more than 14 days during any of the years in issue. Because petitioners did not offer any credible evidence, they have not carried their burden of proof, and we sustain respondent's determination that section 280A disallows and limits deductions with respect to Tybee Island. [13]
*367 Respondent disallowed unsubstantiated deductions reported on Schedule E of petitioners' returns. Petitioners did not offer any evidence to substantiate those deductions. Although we are permitted to apply the rule of Cohan v. Commissioner, 39 F.2d 540 (2d Cir. 1930), petitioners have not provided sufficient evidentiary basis for estimating deductible expenditures. See Sivic v. Commissioner, T.C. Memo. 1993-54. We sustain respondent's disallowance of unsubstantiated deductions. Respondent also disallowed depreciation deductions for the years in issue because she determined that Tybee Island had been fully depreciated in prior years. Petitioners did not offer any evidence to substantiate Mr. Park's assertion that, although the Tybee Island property was purchased in 1975, it was not placed in service until 1984. If Tybee Island was placed in service in 1984, Form 4562 of Mr. Park's 1984 tax return should have indicated that it was placed in service in 1984, and his prior returns should have shown (by omission) that the property had not been placed in service. Petitioners did not introduce those returns, or any other *368 independent evidence that Tybee Island was not placed in service until 1984. Because petitioners did not carry their burden of proof, we sustain respondent's disallowance of depreciation deductions for the years in issue. Issue 4. Schedule E -- Trailer
Petitioners did not offer any evidence to substantiate deductions in excess of those allowed by respondent. Although the rule of Cohan v. Commissioner, supra, would be applicable, petitioners have not provided sufficient evidentiary basis for estimating deductible expenditures. Petitioners also did not explain why respondent's determination with respect to the method of depreciation of the trailer was improper. Because petitioners have the burden of proof, Rule 142(a), we sustain respondent's determination. Issue 5. Contribution Deductions
For the years in issue, charitable contributions of money are allowed as deductions only if verified in accordance with the requirements of section 1.170A-13(a), Income Tax Regs. Sec. 170(a)(1). To verify a charitable contribution, a taxpayer must provide a canceled check, a receipt from the donee organization, or other reliable written records. *369 Sec. 1.170A-13(a)(1), Income Tax Regs. Other reliable written records must show the name of the donee organization, the date of the donation, and the amount of the donation. Sec. 1.170A-13(a)(1)(iii), Income Tax Regs. Contemporaneity and regularity are generally badges of reliability, but the reliability of written records is determined by all the facts and circumstances. Sec. 1.170A-13(a)(2)(i), Income Tax Regs.
Petitioners provided the "1985" date book, the "1986" date book, and the 1987 date book to substantiate a portion of their claimed charitable contributions. [14] Although contemporaneous diary entries may generally be considered reliable evidence of charitable contributions, sec. 1.170A-13(a)(2)(i), Income Tax Regs., we have found that petitioners' date books were not kept contemporaneously and that the entries are incredible. See supra pp. 17-20. Petitioners have not provided reliable written records that they made contributions in excess of the amounts allowed by respondent. We therefore sustain respondent's disallowance of deductions for unsubstantiated charitable contributions. *370 Issue 6. Additions to Tax -- Failure To File
If a taxpayer fails to file a return by the due date, including extensions of time for filing, and cannot show that the failure is due to reasonable cause and not willful neglect, section 6651(a)(1) imposes an addition to tax equal to 5 percent of the tax for each month, or fraction of a month, that the return is late, not to exceed 25 percent of the tax. Because petitioners have the burden of proof, Rule 142(a), and did not explain their failure to file timely returns, respondent's determinations of additions to tax will be sustained, subject to recomputation under Rule 155. Issue 7(a). Additions to Tax -- Negligence
Section 6653(a) imposes an addition to tax equal to 5 percent of the underpayment if any part of an underpayment is due to negligence or intentional disregard of rules and regulations. Negligence is "generally defined as a lack of due care or a failure to do what a reasonable person would do under the circumstances." Leuhsler v. Commissioner, 963 F.2d 907, 910 (6th Cir. 1992), affg. T.C. Memo. 1991-179. An experienced taxpayer's failure to keep *371 records is a clear indication of negligence. Wexler v. Commissioner, 241 F.2d 304, 305 (6th Cir. 1957), affg. T.C. Memo. 1955-122. Taxpayers have the burden of proving that their underpayment was not due to negligence or intentional disregard of rules and regulations. Leuhsler v. Commissioner, supra at 910. Petitioners provided no evidence that their underpayments were not due to negligence or intentional disregard of rules or regulations. Even uneducated and inexperienced taxpayers know to report all their income, and, as a paid preparer who is held to the standard of a reasonable person in similar circumstances, Mr. Park should have done that and kept adequate records. Subject to recomputation under Rule 155, respondent's determinations of section 6653(a) additions to tax are sustained. Issue 7(b). Additions to Tax -- Substantial Understatement
For all 3 years in issue, respondent determined additions to tax for substantial understatements under section 6661. If there is a substantial understatement of income tax for 1985, 1986, or 1987, section 6661(a) imposes an addition *372 to tax equal to 25 percent of the underpayment attributable to the understatement for that year. Pallottini v. Commissioner, 90 T.C. 498, 503 (1988). An understatement is substantial if it exceeds the greater of 10 percent of the tax required to be shown or $ 5,000. Sec. 6661(b)(1)(A). The Commissioner's determinations of the additions to tax for substantial understatement are presumed to be correct, and the taxpayer has the burden of proving that he is not liable for those additions. Rule 142(a). An "understatement" is defined as the excess of the tax required to be shown on the return over the tax actually shown on the return, sec. 6661(b)(2)(A), but an understatement that is not attributable to a tax shelter will be reduced if the taxpayer either had substantial authority for, or adequately disclosed the relevant facts affecting, the tax treatment shown on the return, sec. 6661(b)(2)(B). Obviously, there can be no authority for petitioners' failure to report all their income or their overstatement of deductions. Petitioners did not attach any disclosure statements to their returns, sec. 1.661-4(b), Income Tax Regs., and the returns did not *373 provide enough information to enable respondent to identify potential controversy, Schirmer v. Commissioner, 89 T.C. 277, 285-286 (1987). The understatements, as defined by section 6661(b)(2)(A), will not be reduced. If a taxpayer shows that there was reasonable cause for an understatement and that he acted in good faith, the Secretary may waive all or any part of the section 6661(a) addition to tax. Sec. 6661(c). The taxpayer must prove that the Secretary abused his discretion by denying the waiver of the section 6661(a) addition to tax. Mailman v. Commissioner, 91 T.C. 1079, 1083 (1988). To meet this burden the taxpayer ordinarily must show (i) that he requested a waiver under section 6661(c), Klieger v. Commissioner, T.C. Memo. 1992-734, (ii) that respondent refused the request, id., and (iii) that reasonable cause and good faith are so clear that the Secretary's refusal to waive the addition to tax was arbitrary, capricious, or without sound basis in fact, Mailman v. Commissioner, supra at 1084. Inasmuch as petitioners did not provide any evidence *374 that they had requested a waiver, respondent had no occasion to deny their request, and, in any event, petitioners failed to show reasonable cause for the understatements. We therefore sustain respondent's determinations of section 6661(a) additions to tax, subject to recomputation under Rule 155. To reflect the foregoing, Decision will be entered under Rule 155. Appendix Schedule of 1985 Gross Receipts
Average charge
Number
Gross per return
prepared
receipts
Category of return:
1040A
$  7.50
156
$  1,170.00 1040
30.00
248
7,440.00 Schedule C or F
returns
40.00
220
8,800.00 17,410.00 Less no-charge returns
25.00
40
(1,000.00)
Gross receipts from preparing returns
16,410.00 Bookkeeping receipts
375.00 Equipment rental receipts
50.00 Total 1985 gross receipts
16,835.00 Schedule of 1986 Gross Receipts
Average charge
Number
Gross per return
prepared
receipts
Category of return:
1040A
$  7.50
151
$  1,132.50 1040
30.00
453
13,590.00 Schedule C or F
returns
50.00
32
1,600.00 16,322.50 Less no-charge returns
25.00
48
(1,200.00)
Total 1986 gross receipts
15,122.50 *375 Schedule of 1987 Gross Receipts
Average charge
Number
Gross per return
prepared
receipts
Category of return:
1040A
$  7.50
160
$  1,200.00 1040
30.00
253
7,590.00 Schedule C or F
returns
47.50
245
11,637.50 20,427.50 Less no-charge returns
30.00
43
(1,290.00)
Total 1987 gross receipts
19,137.50 Footnotes
1. Plus 50 percent of the interest payable on $ 8,250.↩
1. Plus 50 percent of the interest payable on $ 7,158.41 and $ 6,918.53 for 1986 and 1987, respectively.↩
1. Respondent and Mrs. Park have stipulated that, if the understatement of tax attributable to unreported income for 1986 or 1987 is greater than $ 500, Mrs. Park qualifies as an innocent spouse under Sec. 6013(e) with respect to this adjustment (but not to the remaining adjustments) for that year.↩
2. If these deductions are disallowed for 1987, petitioners may be entitled to the standard deduction under Sec. 63(c), an issue that can be resolved by the Rule 155 computation.↩
3. Respondent and Mrs. Park have stipulated that, for 1986 and 1987, Mrs. Park is not liable for the additions to tax for negligence attributable to the unreported income -- although she is liable for the parts of such additions attributable to the remaining adjustments.↩
4. A DLN is a series of letters and numbers assigned to, and imprinted on, each return when it is received by an IRS service center. Each DLN indicates which service center processed the return, the type of return processed, and other information not relevant in this case. See Bagby v. Commissioner, 102 T.C. 596, 603↩ (1994).
5. If a return included both a Schedule C and a Schedule F, respondent counted that return as one Schedule C or F return.↩
6. Respondent's agent found that the number of returns identified by this comparison was not significant as compared to the time required to identify them, and did not make the same comparison for 1986 and 1987. We find this to be a conservative and appropriate approach.↩
7. Respondent increased the rates for Schedule C or F returns for 1987 because Mr. Park's 1987 ledger lists 25 returns for which Mr. Park charged $ 65 and two returns for which he charged $ 75.↩
8. Because respondent was conservative when determining the number of Schedule C or F returns prepared in 1986, she determined that Mr. Park prepared 32 Schedule C or F returns. Mr. Park's 1986 ledger shows that he charged fifty-eight people $ 50 each to prepare their returns. We accept Mr. Park's ledgers as an admission that he charged at least 32 people $ 50 each to prepare their returns. Cf. respondent's use of the ledgers described supra↩ note 7.
9. For 1986 and 1987, Mr. Park's ledger included notations indicating various persons' first names and an amount (usually $ 20). Respondent accepted Mr. Park's assertion that these notations were his record of cash payments for office work.↩
10. The date books and notebook were also provided to substantiate claimed charitable contributions. See infra↩ p. 22.
11. Example: Jan. 12 is shown in the "1985" date book as a Sunday, but Jan. 12, 1985, was a Monday.↩
12. Example: Jan. 14 is shown in the "1986" date book as Sunday, but Jan. 14, 1986, was a Tuesday.↩
13. Respondent's statutory notice of deficiency does not indicate if any of Mr. Park's claimed loss for 1985 was limited by reason of sec. 280A(c)(5), or if any amount not allowable by reason of that paragraph was taken into account as a deduction for 1986. To the extent any amount for 1985 was not allowable as a deduction by reason of sec. 280A(c)(5), the amount disallowed shall be carried forward as provided by that section. Sec. 280A(c)(5)↩.
14. If the date books had been credible, they would have substantiated $ 873, $ 605, and $ 625 for 1985, 1986, and 1987, respectively.↩