T.C. Memo. 2001-166

UNITED STATES TAX COURT

MARIE KEY AND DAVID GLEN KEY, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 15117-98.                    Filed July 5, 2001.

Marie Key and David Glen Key, pro sese.

<u>S. Katy Lin</u> and <u>Caroline Tso Chen</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

VASQUEZ, <u>Judge</u>:  Respondent determined a deficiency of
$246,169 in petitioners' 1995 Federal income tax.  Unless
otherwise indicated, all section references are to the Internal
Revenue Code in effect for the year in issue, and all Rule
references are to the Tax Court Rules of Practice and Procedure.

After concessions,[1] the issues for decision are (1) whether petitioners underreported their income for 1995 from their business reported on Schedule C, Profit or Loss From Business, and (2) whether petitioners are liable for self-employment tax on the net profit of the Schedule C business.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts, first supplemental stipulation of facts, and the attached exhibits are incorporated herein by this reference. At the time they filed their petition, Marie Key and David Glen Key resided in California.

Multilevel Marketing Business

In early 1995, until approximately April 1995, Mr. Key sold self-help motivational tapes for a multilevel marketing business called Commonwealth. After being terminated from Commonwealth in April or May 1995, Mr. Key started his own multilevel marketing business, modeled after Commonwealth, called The Winning Edge. Mr. Key later changed the business' name to The Ultimate Comeback. Marie Key did administrative work for The Ultimate Comeback.

The Ultimate Comeback marketed and sold a product called "The Credit Maze Program" (the Credit Maze). The Credit Maze was

---

[1] Respondent concedes that petitioners are not liable for $203,440 of the $545,715 of additional Schedule C business income determined in the statutory notice of deficiency.

a "credit repair" program.  The Ultimate Comeback offered three "phases" for the marketing and sale of the Credit Maze.

The Ultimate Comeback's orientation guide states that in order to be a member in phase I an interested party paid $1,250 plus a $50 administrative fee for a copy of the Credit Maze product.  The broker[2] for the phase I member received 90 percent of the $1,250 payment.

The Ultimate Comeback's orientation guide states that in order to be a member in phase II, an interested party paid $6,250 plus a $75 administrative fee for a seminar related to the Credit Maze.  The broker[3] for the phase II member received 90 percent of the $6,250 payment.

The Ultimate Comeback's orientation guide states that in order to be a member in phase III, an interested party paid $31,250 for a financial education seminar in Hawaii.  The broker[4] for the phase III member received 90 percent of the $31,250 payment.

Not all new phase I, II, and III members paid the amounts listed in the orientation guide.  Everyone who transferred from

_____

[2]  In order to be a phase I broker, a member had to recruit six additional phase I members.

[3]  In order to be a phase II broker, a member had to recruit six additional phase II members.

[4]  In order to be a phase III broker, a member had to recruit two additional phase III members.

Commonwealth to The Ultimate Comeback was "grandfathered" in and paid zero for their membership in phase I. Some members paid a reduced amount for their phase I, II, and/or III memberships, and brokers sold the memberships at cost ($125 for phase I, $625 for phase II, and $3,125 for phase III). Additionally, many members did not pay administrative fees.

The Ultimate Comeback offered another program unrelated to the Credit Maze. The Ultimate Comeback's orientation guide states that in the "Wealth Preservation" program (Wealth Preservation), participants paid $625 to purchase a manual that discussed financial instruments used to preserve assets. The broker[5] for the Wealth Preservation member received 80 percent of the $625 payment.

The Ultimate Comeback maintained membership lists for Wealth Preservation and phases I, II, and III compiled by phase, member name, and broker name. Mr. Key's name is listed as the broker for 21 people in Wealth Preservation, 67 people in phase I, 40 people in phase II, and 13 people in phase III.

Mr. Key requested that payments to himself and The Ultimate Comeback be made in cash, cashier's checks, or money orders. Petitioners failed to maintain any tax records (i.e., general

---

[5] In order to be a Wealth Preservation broker, a member had to recruit two additional Wealth Preservation members.

ledgers, check disbursement records, cash receipts journals, income or sales journals, or records of summaries).

Petitioners' Personal Expenses

During 1995, petitioners spent $2,586.87 a month on personal expenditures that included, among other things, utilities, clothing, storage, housewares, automotive, and leisure expenses. From January through July 1995, petitioners paid $1,700 a month rent on a residence known as "100/101 Santes". On or about July 2, 1995, petitioners paid a $1,500 deposit on a rental home located in Wildomar, California (Wildomar home). From July through December 1995, petitioners paid $1,190 a month rent for the Wildomar home.

On or about March 11, 1995, petitioners paid $7,000 in cash to purchase a Mercedes. On June 27, 1995, petitioners paid off their Astro minivan with a $2,135 cashier's check. On August 5, 1995, petitioners purchased appliances for $2,368.02 and $473.02. During 1995, petitioners purchased an Acura NSX for $40,000 in cash.

Petitioners' Bank Accounts

Petitioners maintained bank accounts at Great Western Bank. As of January 1, 1995, petitioners had a zero balance in their accounts.

Mr. Key's Arrest, the Money in His Possession When Arrested, and Petitioners' Conviction

On or about November 28, 1995, under an alias, Mr. Key was staying at the Hilton Hotel in Anaheim, California. On that date, the Anaheim Police Department arrested Mr. Key and seized from him cash totaling $302,515.25 and postal money orders totaling $15,750.

In November 1995, the Riverside County Sheriff's Department seized from Mr. Key 24 cashier's checks, made out to him, totaling $105,175. These checks were for the following amounts: 1 for $2,250, 1 for $3,000, 1 for $4,325, 2 for $1,300, 2 for $4,000, and 17 for $5,000. Many of the checks are numbered sequentially and were purchased on the same date.

On June 29, 1998, petitioners were convicted of separate counts of unlawfully preparing and operating an endless chain scheme in violation of California Penal Code section 327 for their activities in connection with The Ultimate Comeback.[6]

Petitioners' Tax Returns

Petitioners informed a revenue officer that they did not have any income for 1993 and 1994 for which U.S. Individual Income Tax returns needed to be filed. During 1993, petitioners filed bankruptcy and were discharged in 1994.

On February 24, 1997, petitioners filed their 1995 joint

---

[6] The appellate court affirmed petitioners' convictions and the Supreme Court of California denied petitioners' petition for review. People v. Key, No. S091405, (Cal., Nov. 15, 2000).

individual Federal income tax return (the return).  The return

included a Schedule C.  The Schedule C lists Mr. Key as the sole

proprietor of a "multi-level marketing" activity with the name

The Ultimate Comeback.  Petitioners reported $495,000 of gross

receipts, $153,816 of expenses, and $341,184 of net profit from

The Ultimate Comeback.  The return reported total adjusted gross

income of $341,184 and listed a tax due of $103,273.  Petitioners

did not pay any of this amount when they filed the return.

Petitioners did not report or pay any self-employment taxes on

the net profit of The Ultimate Comeback.  Petitioners reported no

income from Commonwealth.

OPINION

## I.    Unreported Income

Every individual liable for tax is required to maintain

books and records sufficient to establish the amount of his or

her gross income.  Sec. 6001; DiLeo v. Commissioner, 96 T.C. 858,

867 (1991), affd. 959 F.2d 16 (2d Cir. 1992).  For the years in

question, we find that petitioners maintained inadequate books

and records--in fact, they maintained no tax records whatsoever

(i.e., general ledgers, check disbursement records, cash receipts

journals, income or sales journals, or records of summaries).

Where a taxpayer fails to maintain or produce adequate books

and records, the Commissioner is authorized to compute the

taxpayer's taxable income by any method that clearly reflects

income.  Sec. 446(b); Holland v. United States, 348 U.S. 121 (1954); Webb v. Commissioner, 394 F.2d 366, 371-372 (5th Cir. 1968), affg. T.C. Memo. 1966-81.  The reconstruction of income need only be reasonable in light of all surrounding facts and circumstances.  Giddio v. Commissioner, 54 T.C. 1530, 1533 (1970).  The Commissioner is given latitude in determining which method of reconstruction to apply when a taxpayer fails to maintain records.  Petzoldt v. Commissioner, 92 T.C. 661, 693 (1989).

The Commissioner's determinations generally are presumed correct, and the taxpayer bears the burden of proving that those determinations are erroneous.[7]  Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933); Durando v. United States, 70 F.3d 548, 550 (9th Cir. 1995).  The U.S. Court of Appeals for the Ninth Circuit, to which an appeal of this case would lie, has held that in order for the presumption of correctness to attach to the notice of deficiency in unreported income cases,[8] the

---

[7]  Petitioners argue that, pursuant to sec. 7491(b), respondent bears the burden of proof because respondent used statistical methods to reconstruct petitioners' income.  Sec. 7491(b) was enacted as part of the Internal Revenue Service Restructuring and Reform Act of 1998 (RRA 1998), Pub. L. 105-206, sec. 3001(c), 112 Stat. 685, 726, and is effective for examinations commenced on or after July 22, 1998.  See Higbee v. Commissioner, 116 T.C. ___, ___ (2001) (slip op. at 5); RRA 1998 sec. 3001(c), 112 Stat. 685, 727.  The examination in this case commenced prior to July 22, 1998.  Accordingly, sec. 7491 is inapplicable.

[8]  Although Weimerskirch v. Commissioner, 596 F.2d 358 (9th (continued...)

Commissioner must establish "some evidentiary foundation" linking the taxpayer to the income-producing activity, Weimerskirch v. Commissioner, 596 F.2d 358, 361-362 (9th Cir. 1979), revg. 67 T.C. 672 (1977), or "demonstrating that the taxpayer received unreported income", Edwards v. Commissioner, 680 F.2d 1268, 1270 (9th Cir. 1982); see also Rapp v. Commissioner, 774 F.2d 932, 935 (9th Cir. 1985). Once there is evidence of actual receipt of funds by the taxpayer, the taxpayer has the burden of proving that all or part of those funds are not taxable. Tokarski v. Commissioner, 87 T.C. 74 (1986).

There is ample evidence linking petitioners to an income-producing activity, and respondent has demonstrated that petitioners received unreported income.

A.    Unit and Volume Method

The first method respondent employed on brief to reconstruct petitioners' gross receipts from the multilevel marketing business was the unit and volume method. This method of proof is an established method accepted by the Court. See King v. Commissioner, T.C. Memo. 1998-69, affd. without published opinion 182 F.3d 903 (3d Cir. 1999); Park v. Commissioner, T.C. Memo.

---

[8](...continued)
Cir. 1979), revg. 67 T.C. 672 (1977), was an unreported income case regarding illegal source income, the U.S. Court of Appeals for the Ninth Circuit applies the Weimerskirch rule in all cases involving the receipt of unreported income. See Edwards v. Commissioner, 680 F.2d 1268, 1270-1271 (9th Cir. 1982); Petzoldt v. Commissioner, 92 T.C. 661, 689 (1989).

1994-343; <u>Rowell v. Commissioner</u>, T.C. Memo. 1988-410, affd. 884 F.2d 1085 (8th Cir. 1989).

To determine gross receipts, respondent used information contained in The Ultimate Comeback's orientation guide and membership lists. Respondent determined how many units Mr. Key handled (i.e., transactions for which Mr. Key was the broker). Respondent multiplied the units by the full amount listed in the orientation guide as the cost of each unit (i.e., $1,250 for phase I, $6,250 for phase II, $31,250 for phase III, and $625 for Wealth Preservation). Respondent then added the administrative fees charged for each phase and Wealth Preservation.

On brief, respondent notes that he modified this analysis to account for testimony received at trial from witnesses who testified they paid less than the value listed in the orientation guide. Using this methodology, respondent computed petitioners' total gross receipts to be $868,400. Petitioners reported $495,000 of gross receipts on their Schedule C. Thus, respondent calculated a $373,400 understatement of income.

We conclude that this analysis is flawed in two respects. The first flaw in respondent's analysis is that respondent attributed 100 percent of the payments for each phase and Wealth Preservation to Mr. Key. According to the orientation guide, the broker on a transaction for phase I, II, and III received only 90

percent of the fee and for Wealth Preservation received only 80 percent of the fee.

The second flaw is respondent's assumption that everyone who purchased into Wealth Preservation and phase I, II, and III, other than the witnesses who testified at trial, paid these full amounts. Several witnesses credibly testified that they themselves and others they recruited into The Ultimate Comeback did not pay the amounts listed in the orientation guide. Some paid a slightly reduced amount, some paid cost, others paid nothing at all, and many did not pay an administration fee. We conclude that respondent's application of the unit and volume method does not clearly reflect petitioners' income; therefore, we shall not adopt the figures determined by respondent under this method. See sec. 446(b); Holland v. United States, 348 U.S. 121 (1954); Webb v. Commissioner, supra at 371-372.

B. Net Worth Method

An alternative method respondent employed on brief to reconstruct petitioners' income from the multilevel marketing business was the net worth method. This method of proof is an established method accepted by the courts. See Holland v. United States, supra.

Under the net worth method, the taxpayers' opening net worth for the taxable year is established. Increases in net worth are added to the opening net worth. Nondeductible expenditures

increase this amount. Items attributable to nontaxable sources decrease this amount. If the resulting figure for the year is greater than the taxable income reported, then the excess represents unreported taxable income. See id. at 125. The Commissioner must establish the opening net worth with reasonable certainty and show a likely source of unreported income or negate nontaxable sources. See id. at 132-138; Brooks v. Commissioner, 82 T.C. 413, 431-432 (1984), affd. without published opinion 772 F.2d 910 (9th Cir. 1985).

As of January 1, 1995, petitioners had a zero balance in their bank accounts. Petitioners testified that they did not file income tax returns for 1993 and 1994 because they made less than the amount required to "trigger" the filing requirement. Mr. Key testified that in 1993 petitioners filed for bankruptcy. Mr. Key further testified petitioners had absolutely nothing when they started The Ultimate Comeback. Based on the evidence, we conclude that respondent correctly began the net worth analysis with a zero net worth for petitioners as of January 1, 1995.

Respondent then multiplied petitioners' monthly personal expenditures for 1995 ($2,586.87) by 12. This totals $31,042.44. Next, respondent multiplied petitioners' monthly rental expense times 12. Respondent adopted $1,190 as the amount of rent. We found that petitioners paid $1,700 for the first 6 months of 1995 and $1,190 for the last 6 months of 1995. Petitioners' rental

expenses for 1995 therefore total $17,340. Petitioners' total yearly expenses for 1995 equal $48,382.44.

Respondent then added in petitioners' "one time" personal expenditures (i.e., the rent deposit, the Mercedes purchase, the Astro Minivan payment, the appliance purchases, and the Acura purchase). These expenses total $53,476.04. Thus, petitioners' total personal expenditures for 1995 equal $101,858.48.

Next, respondent added the cash ($302,515.25), money orders ($15,750), and cashier's checks ($105,175) seized from Mr. Key in November 1995. This amount totals $423,440.25. Responded added this amount to petitioners' total personal expenditures for 1995 ($101,858.48) bringing the final total to $525,298.73.

Subtracting petitioners' reported adjusted gross income ($341,184) from the amount calculated via the net worth method results in unreported income of $184,114.73. Based upon the foregoing, we conclude that in 1995 petitioners had $184,114.73 of unreported income from The Ultimate Comeback.

II. Self-Employment Tax

Respondent argues that in 1995 petitioners had self-employment income based on petitioners' reported and unreported income from The Ultimate Comeback, and petitioners owe self-employment tax based on that income.

Section 1401 imposes self-employment tax on self-employment income. Section 1402 defines net earnings from self-employment as the gross income derived by an individual from the carrying on

of any trade or business by such individual less allowable deductions attributable to such trade or business.

We agree with respondent.  We conclude that petitioners are liable for self-employment tax in 1995 in accordance with section 1401 based upon petitioners' self-employment income (including the reported and unreported income) from The Ultimate Comeback.

To reflect the foregoing,

<u>Decision will be entered under Rule 155</u>.